Shirley PITTMAN, et al., individually
and as class representatives,
Plaintiffs–Appellants,

v.

CHICAGO BOARD OF EDUCATION,
et al., Defendants–Appellees.

No. 94–2850.

United States Court of Appeals,
Seventh Circuit.

Argued June 5, 1995.

Decided Sept. 1, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied Nov. 14, 1995.

Ronald Cope, David Lincoln Ader (argued), John F. Donahue, Ancel, Glink, Diamond, Cope & Bush, Chicago, IL, for Shirley Pittman, Bruce Brendt, Ralph Cusick, David T. Peterson, Gwendolyn Steele–Boutte, Frederick Sears.

Iris E. Sholder, Patricia J. Whitten, Michael J. Hernandez, Camille E. Willis, City of Chicago Board of Education, Chicago, IL, for Chicago Board of Education.

Deborah L. Ahlstrand, Asst. Atty. Gen., Civil Appeals Division, Chicago, IL, for Roland W. Burris.

Sharon Baldwin, Lawrence Rosenthal, Deputy County Counsel, Mardell Nereim (argued), Benna R. Solomon, Susan S. Sher, Office of Corporation Counsel, Appeals Division, Chicago, IL, for Richard M. Daley.

Michael Sweeney, David D. Meyer, Sidley & Austin, Chicago, IL, for Schools First, Chicago Urban League, North River Commission, Chicago Neighborhood Organizing Project, Parents United for Responsible Education, United Neighborhood Organization, Citizen Schools Committee, Ophelia Askew, Ana C. Benson, Sokoni Karanja, Iva Lane, Donald Moore, Julie Woestehoff, amici curiae.

Before POSNER, Chief Judge, and FLAUM and EASTERBROOK, Circuit Judges.

POSNER, Chief Judge.

Until 1988, principals of public schools in Chicago were appointed by the city's board of education, and upon satisfactory completion of three years' service received tenure as principals. In 1988, the state ordained the creation of a local school council for each public school in Chicago. See 105 ILCS 5/34–2.1. Each council was to consist of the principal of the school plus ten members elected for two-year terms, increased by a subsequent amendment to four years. Two of the elected members were required to be teachers and were to be elected by the public school's staff. Six were required to be parents of children attending the school and were to be elected only by such parents. The remaining two elected members were required to be residents of the area served by the school (but not parents of children attending it) and these two were to be elected by all such residents. The most important powers of a local school council are the selection of the principal and the approval of a plan for the expenditure of the funds allocated to the school by the board of education. The council has no taxing authority and no control over the size of the school's budget, as distinct from the allocation of the budget among the school's activities.

Public school principals mounted a state and federal constitutional challenge to the new law in the Illinois courts, and in 1990 the state's highest court held that the part of the law that limited the eligible voters for the different classes of council members (only staff could elect the teacher members, only parents the parent members, only residents the resident members) violated the equal protection clauses of both constitutions. *Fumarolo v. Chicago Board of Education*, 142 Ill.2d 54, 153 Ill.Dec. 177, 566 N.E.2d 1283 (1990). A year later the state legislature amended the school law. A minor change was that the teacher members of the council would be appointed by the board of education and the principal rather than elected by the school's staff. The major change, designed to conform to *Fumarolo*, was that all eligible voters—that is, all adult residents of the school's district and all parents whether or not residents—could vote for all classes of members of the council, each voter being given five votes (which will be reduced to three beginning in 1998) to allocate as he pleased among the candidates. Still, of the elected members, now down to eight, six had to be parents and the other two residents.

The principals decided to challenge the new law in federal rather than state court, and brought this suit. The district court certified one class consisting of all principals of Chicago public schools and a second consisting of principals who are residents of Chicago and thus eligible to vote for members of at least one of the local school councils—of which there are more than 500. The district court granted summary judgment for the defendants (the board of education, the mayor, and the state's attorney general), and the plaintiffs appeal. The resident principals complain that their right to vote for representatives of their choice on the local school councils has been unconstitutionally bobtailed by the provision reserving six offices for parents and only two for residents. All the principals complain that by eliminating their tenure as principals the law violates rights of property and contract that are protected by the U.S. Constitution. So we have a right to vote claim and a right of property claim, and let us begin with the first.

The school law does not permit public school principals to be candidates for the local school councils. Each principal is an ex officio member of the council for his school but may not run in the election for members of any other council. The principals do not complain about this exclusion, and hence they cannot assert any rights that they might have as persons desiring to run in these elections, rights under the First Amendment or the equal protection clause recognized in such cases as *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 186, 99 S.Ct. 983, 991, 59 L.Ed.2d 230 (1979); *Clements v. Fashing*, 457 U.S. 957, 964–66, 102 S.Ct. 2836, 2844–45, 73 L.Ed.2d 508 (1982) (plurality opinion); *Brazil–Breashears v. Bilandic*, 53 F.3d 789, 792–93 (7th Cir.1995), and *Hatten v. Rains*, 854 F.2d 687, 693 (5th Cir.1988). The defendants fasten on this omission, arguing that the right of the resident principals to vote in these elec-

tions, as distinct from their non-asserted right to run, cannot be infringed by a limitation on eligibility for candidacy. The current school law, under compulsion of the decision in the *Fumarolo* case, gives each resident of each local school district the same number of votes, and this is all that is necessary, the defendants argue, to secure the right to vote held implicit in the First Amendment and the equal protection clause. E.g., *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 2063–64, 119 L.Ed.2d 245 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 787–88, 103 S.Ct. 1564, 1569–70, 75 L.Ed.2d 547 (1983); *Board of Estimate v. Morris*, 489 U.S. 688, 692, 109 S.Ct. 1433, 1437–38, 103 L.Ed.2d 717 (1989). Since in all likelihood residents who do not have children in the public schools outnumber those who do, the residents will be able to dominate the local school councils despite the reservation of places for parents (as well as for teachers and the principal), since elected officials whatever their personal interests or beliefs can be counted on to represent adequately the dominant voting blocs.

At the same time, and inconsistently, the defendants argue that the reservation of places for parents is reasonable because parents have a greater stake in the proper management of the schools in which their children are enrolled than other residents of the school district do. If this is so, it implies that parents cannot be trusted to be the perfect agents of the nonparent residents who vote for them. Parents are assumed to have their own agenda, shaped by their parental status.

■ Anyway it is false that limitations on candidacy cannot infringe the right to vote. *Anderson v. Celebrezze, supra*, 460 U.S. at 786, 103 S.Ct. at 1568; *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 855–56, 31 L.Ed.2d 92 (1972). This would be obvious if the limitations were so designed as to permit only one eligible candidate, so that the electorate would have no actual voting power. The school law is less extreme. But if we assume realistically that persons who have children in a school are not adequate representatives, in a body responsible for the governance of the school, of persons who do not, then the school law brings about a sub-

stantial dilution in the voting power of one class of voters, the nonparent residents. Suppose there are 1,200 parents in one of the local school districts and 1,800 nonparent residents, and that the parents vote for parent candidates for the council and the nonparents vote for nonparent candidates. Since there are six of the former and only two of the latter, the result is that the parents obtain a representative by casting on average only 200 votes (1200/6), while the nonparents must cast an average of 900 votes (1800/2) to obtain a representative. This is a clear violation of the principle of "one man, one vote." *Shaw v. Reno*, —— U.S. ——, ——, 113 S.Ct. 2816, 2823, 125 L.Ed.2d 511 (1993); *Board of Estimate v. Morris, supra*, 489 U.S. at 692, 109 S.Ct. at 1437–38; *Risser v. Thompson*, 930 F.2d 549, 553 (7th Cir.1991).

■ Only we do not think the principle applicable to elections to so local and specialized a governmental body as these local school councils. We say this with diffidence because it is not argued by the defendants, who have staked their all on persuading us that the school law does not in fact dilute the voting power of nonparent residents. However, one of the exceptions to the principle of waiver of grounds for reversal that is recognized by the Supreme Court and by this court concerns the interest in maintaining harmonious relations between the states and the federal government ("comity"). *Eaglin v. Welborn*, 57 F.3d 496, 499 (7th Cir.1995) (en banc); *Association of Community Organizations for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 797 (7th Cir.1995); see *Granberry v. Greer*, 481 U.S. 129, 134, 107 S.Ct. 1671, 1675, 95 L.Ed.2d 119 (1987); *Nutall v. Greer*, 764 F.2d 462, 464 (7th Cir.1985). We cannot think of a more compelling occasion for invoking the exception than when we are convinced of the constitutionality of a challenged state statute even though the state's lawyers have blundered, defending the statute's constitutionality on an unconvincing ground and overlooking the only convincing one.

■ The plaintiffs believe that whenever a state decides to make an office elective, *all* the principles that the Supreme Court has extrapolated from the First and Fourteenth

Amendments to regulate the electoral process are fully applicable. If this were so, it would be inconsistent with the principle that the federal Constitution does not prescribe any particular separation of powers, or other internal structure, of state government. E.g., *Whalen v. United States,* 445 U.S. 684, 689 n. 4, 100 S.Ct. 1432, 1436 n. 4, 63 L.Ed.2d 715 (1980); *Hoover v. Wagner,* 47 F.3d 845, 849 (7th Cir.1995); *Auriemma v. Rice,* 957 F.2d 397, 399 (7th Cir.1992); *Ragsdale v. Turnock,* 941 F.2d 501, 510 (7th Cir.1991); *Risser v. Thompson, supra,* 930 F.2d at 554; *Carrick v. Locke,* 882 P.2d 173, 177 n. 1 (Wash.1994); *Bayh v. Sonnenburg,* 573 N.E.2d 398, 404 and n. 8 (Ind.1991). For it would mean that while the state was free to decide which offices of state government should be elective and which appointive, it could not create hybrid bodies—such as these local school councils, which have ex officio as well as elected members (some of the ex officio members are the very principals who are challenging the law!)—or otherwise depart from the "democratic" electoral model. What purpose would be served by such rigidity we cannot imagine. More to the point, the law does not require such rigidity. The Supreme Court has allowed states to create special-purpose units of government in which offices are filled by elections no less truncated or bobtailed than the elections for local school councils in the Chicago public school system. *Salyer Land Co. v. Tulare Lake Basin Water Storage District,* 410 U.S. 719, 731–33, 93 S.Ct. 1224, 1231–32, 35 L.Ed.2d 659 (1973); *Ball v. James,* 451 U.S. 355, 371, 101 S.Ct. 1811, 1821, 68 L.Ed.2d 150 (1981); *Associated Enterprises, Inc. v. Toltec Watershed Improvement District,* 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675 (1973) (per curiam). These cases involved irrigation districts in which candidates and electors were limited to farmers, but a number of decisions in lower courts, including our own, have refused to apply the principle of "one man, one vote" to other types of special-purpose governmental bodies as well. *Cantwell v. Hudnut,* 566 F.2d 30 (7th Cir.1977); *State v. Frontier Acres Community Development District,* 472 So.2d 455, 457 (Fla.1985); *Southern California Rapid Transit District v. Bolen,* 1 Cal.4th 654, 3 Cal.Rptr.2d 843, 852, 822 P.2d 875, 884 (1992).

Asked about the Supreme Court cases at argument, the plaintiffs' lawyer said that they involved activities that were the exclusive concern of a particular occupational group, whereas education affects everybody. Yet agriculture has long been recognized as a national activity, *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), whereas the Supreme Court has recently noted the local character of public-school education. *United States v. Lopez,* — U.S. —, —, 115 S.Ct. 1624, 1633, 1634, 131 L.Ed.2d 626 (1995). Of course education does affect everybody, directly or indirectly, but so does agriculture and in either case it would be absurd to suggest that every adult in the United States should be constitutionally entitled to vote in every election for a local irrigation district or a local school council.

The line between a general-purpose governmental body and a special-purpose (or, as it is sometimes called, a "proprietary") one is wavering and indistinct. We are not even certain that it is the correct line. In *Kramer v. Union Free School District No. 15,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), the Supreme Court invalidated a state law that restricted voting for members of school boards to persons who either owned or rented property in the school district or had custody of children in the district's public schools. The school board was a special-purpose governmental body, just like the local school councils in this case—and indeed both cases involve the same special governmental function, education. Similar to *Kramer* is *Hadley v. Junior College District,* 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970), only involving a junior college district rather than a school district. But there is an important distinction between *Kramer* and *Hadley* on the one hand and our case on the other hand. The school board in *Kramer* and the board of trustees of the junior college district in *Hadley* had the power to tax. 395 U.S. at 623 n. 3, 89 S.Ct. at 1888 n. 3; 397 U.S. at 53–54, 90 S.Ct. at 793–94. The local school councils in our case do not. Taxation without representation is abhorrent to Americans, but these local school councils

have no power to tax directly and they also have no power to tax indirectly, for they do not have the power to raise revenues through the sale of bonds or to increase the total spending on the schools. There are more than 500 of these councils—all within a single city—and the writ of each one runs no farther than a single school. Basically they select a principal and determine school expenditures but within budgetary limits set by the board of education. They have less power than the board of trustees of a private school.

We are mindful that in neither *Kramer* nor *Hadley* did the Supreme Court single out the power to tax as critical to the decision; and when it came to distinguish these cases in the later irrigation-district decisions the basis for distinction that the Court offered was that nowadays education unlike irrigation is regarded as a vital governmental function—a point that had been stressed in *Hadley* itself. *Id.* at 56, 90 S.Ct. at 795; see *Ball v. James, supra,* 451 U.S. at 363, 101 S.Ct. at 1817; id. at 372 n. 1 (concurring opinion); *Salyer Land Co. v. Tulare Lake Basin Water Storage District, supra,* 410 U.S. at 727–29, 93 S.Ct. at 1229–30. But the point has to be considered in context. The boards involved in *Kramer* and *Hadley* were the governing bodies of the schools and colleges, respectively, in the districts. (There seems to have been only one junior college under the governance of the district authority in the *Hadley* case, although this is unclear from the opinions.) The governing body of the public schools of Chicago is the Board of Education of the City of Chicago, not these local councils. Vital public education may be, but these councils, unlike the boards in *Kramer* and *Hadley,* do not control it. The interest of the public at large in the councils is therefore attenuated. Cf. *Southern California Rapid Transit District v. Bolen, supra,* 822 P.2d at 884.

■ But even if, as we believe, the restriction on voting for the councils is not rendered invalid by the "one man, one vote" rule, it could still be invalid because irrational. And so the voter principals argue, but they cannot win on this ground either. It is common knowledge that the public schools of Chicago are a troubled institution. A change in the method of their governance may or may not bring about an improvement. That is a judgment for a legislature to make, not a court. There is a nationwide movement toward the decentralization and privatization of governmental functions, and the parent-centered local school councils are one manifestation of that movement. They are an experiment, and may fail, but federal courts enforcing the indistinct commands of "substantive due process" or "rationality review" ought not to snuff them out. For then we will never learn from experiments in the governance of public institutions. This particular experiment had been up and running for only one year when the lawsuit was filed, and the parties have not placed before us any data concerning the success of the experiment; perhaps it is too soon. We will never be able to evaluate its success if we invalidate the law.

The other cluster of issues in this appeal relates to the principals' loss of tenure. Under the new law, they serve at the pleasure of the local school councils. Being tenured ourselves, we understand the distress felt by the principals at being deprived of an important emolument of their jobs. And although tenure for administrators is uncommon, the school law impairs the principals' tenure as teachers as well. For if they lose their principalship they are not reinstated as teachers but are merely placed on an eligibility list for filling vacancies in teachers' positions as these occur. 105 ILCS 5/34–8.1.

Although we are sympathetic to the principals' plight, and far from certain that the sacrifice that they are being asked to make will produce offsetting benefits to Chicago's public school children, we do not think they have a good constitutional claim. Some of their arguments, such as that the school law is a bill of attainder, are not worthy of discussion. The only two arguments that merit discussion are that the state has impaired the obligation of its contracts, in violation of Article I, section 10 of the Constitution, and that it has taken the principals' property without just compensation, in violation of the Fifth Amendment, held applicable to the states by an interpretation of the Fourteenth Amendment.

██ If tenure for principals were a term in a contract between the principals and the board of education, the state could not abrogate the term without a greater showing of justification than has been attempted. *United States Trust Co. v. New Jersey,* 431 U.S. 1, 29, 97 S.Ct. 1505, 1521, 52 L.Ed.2d 92 (1977); *Peick v. Pension Benefit Guaranty Corp.,* 724 F.2d 1247, 1270 and n. 28 (7th Cir.1983). It is not a term in a contract. It is a term in a statute, and a statute is presumed not to create contractual rights. *National Railroad Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.,* 470 U.S. 451, 465–67, 105 S.Ct. 1441, 1451–52, 84 L.Ed.2d 432 (1985); *Wisconsin & Michigan Ry. v. Powers,* 191 U.S. 379, 387, 24 S.Ct. 107, 108–09, 48 L.Ed. 229 (1903) (Holmes, J.). A statute is not a commitment by the legislature never to repeal the statute. The only way the state can commit itself is by making a contract, and Illinois has signally failed to do that with these public school principals. To treat statutes as contracts would enormously curtail the operation of democratic government. Statutes would be ratchets, creating rights that could never be retracted or even modified without buying off the groups upon which the rights had been conferred. Since it has long been understood that statutes are not contracts (the opinion by Holmes that we cited is from 1903), the principals could not reasonably have relied on the statute giving them tenure as a reason not to ask for a contract. They are entitled to be disappointed by the action of the Illinois legislature in promulgating the new school law, but they are not entitled to be surprised. No justifiable expectation has been defeated.

██ Job tenure is for some purposes "property" within the meaning of the Constitution, and the principals' tenure has been "taken." But there is a missing link in the principals' alternative argument that this taking violates the takings clause. Job tenure is property within the meaning of the due process clauses, *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 538–39, 105 S.Ct. 1487, 1491–92, (1985); *Jungels v. Pierce,* 825 F.2d 1127, 1130 (7th Cir.1987), which protect people against deprivations of life, liberty, or property without due process

of law. As in *Loudermill,* such "property" rights are often found to have been created by statute, see 470 U.S. at 539, 105 S.Ct. at 1491–92, but this is not inconsistent with the presumption that statutes do not create contract rights. The legislature can by amending the statute eliminate the property right; but if the statute created a contract right against the state, then the amendment would impair the obligations of contract.

██ Can by amending the statute eliminate the property right, and did here; and in any event the plaintiffs cannot appeal to the principle that a person cannot be deprived of his property rights without due process of law, because there was no denial of due process. The legislation that deprived the school principals of their tenure ( = property) did not violate any procedural right encompassed by the term "due process of law," and we have already seen that it did not deny "substantive due process." That is why the plaintiffs direct us to the takings clause. But "property" as used in that clause is defined much more narrowly than in the due process clauses. It encompasses real property and personal property, including intellectual property. *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1003–04, 104 S.Ct. 2862, 2873–74, 81 L.Ed.2d 815 (1984). But in this circuit anyway, though the Supreme Court left the issue open in *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 224, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986), it does not extend to contracts, *Pro-Eco, Inc. v. Board of Commissioners,* 57 F.3d 505, 510 (7th Cir.1995); *Peick v. Pension Benefit Guaranty Corp., supra,* 724 F.2d at 1276; but see *Madera Irrigation District v. Hancock,* 985 F.2d 1397, 1401 (9th Cir.1993); Richard A. Epstein, *Takings: Private Property and the Power of Eminent Domain* 88 (1985)—or to statutory entitlements. *Schroeder v. City of Chicago,* 927 F.2d 957, 961 (7th Cir.1991). There is historical warrant for the narrow reading of "property," William Michael Treanor, Note, "The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment," 94 *Yale L.J.* 694, 711 (1985), but the more important reason for the narrow reading is practical. If a statutory benefit could

not be rescinded without the payment of compensation to the beneficiaries, it would be extremely difficult to amend or repeal statutes, creating the ratchet effect that we discussed in connection with the plaintiffs' argument that the school law impairs their contractual rights.

The school law is constitutional.

AFFIRMED.