Steve **SALVATO** and James Duffy, Plaintiffs–Appellants,

v.

**ILLINOIS DEPARTMENT OF HUMAN RIGHTS** and **Illinois Department of Central Management Services**, Defendants–Appellees.

No. 97–2931.

United States Court of Appeals, Seventh Circuit.

Argued May 19, 1998.

Decided Sept. 17, 1998.

Robin B. Potter (argued), Potter & Schaffner, Chicago, IL, Michael P. Latz, North Riverside, IL, for Plaintiffs–Appellants.

Jan E. Hughes (argued), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Defendants–Appellees.

Before CUDAHY, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

The Roman scholar Juvenal once asked *"quis custodiet ipsos custodes"*—roughly translated, "who will guard the guardians"? That must have been what Steve Salvato and James Duffy wondered, when they lost their jobs as Human Rights Specialists at the Illinois Department of Human Rights (IDHR) in the midst of a budget-driven reduction in force. (IDHR is the state agency mandated to enforce and monitor compliance with the anti-discrimination provisions of the Illinois Human Rights Act by state agencies, state contractors, vendors, and employees.) Ironically, Salvato and Duffy believed that IDHR had targeted them for elimination because of their age, respectively 44 years old and 61 years old at the time of the layoffs. After receiving the obligatory right-to-sue letter from the Equal Employment Opportunity Commission (EEOC), they sued the IDHR and the Illinois Department of Central Management Services (CMS) alleging that they had been wrongfully discharged in violation of the federal Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a)(1), and then retaliated against for having complained to the EEOC. 29 U.S.C. § 623(d). The district court granted summary judgment in the defendants' favor on the retaliation claims but allowed the wrongful discharge claims to proceed to trial. At the close of the evidence, the court granted CMS's motion for judgment as a matter of law. The jury then ruled against Salvato and Duffy on the wrongful termination claims remaining

against IDHR, and the court denied their motions for a new trial. We affirm.

## I

As of early 1992, four people held the position of "specialist" in IDHR's Public Contracts Unit: Salvato, Duffy, and two others. Budget cuts were in the air, however, and as of June 30, 1992, IDHR Director Rosemary Bombela knew that her budget had been slashed by $670,000, and she would need to lay off personnel in order to make ends meet. Under standard procedures followed by Illinois state agencies, the affected agency was responsible for formulating a layoff plan and then submitting that plan to CMS for its review and approval. An important part of the CMS review process was to conduct an "adverse impact analysis" to ensure that the layoff plan would not have a disproportionate effect on any legally protected group. Following the approved protocol, Bombela decided first to eliminate all vacant positions, and then, when that proved to be inadequate, to have her supervisors submit names of candidates for layoffs. On July 10, 1992, Bombela submitted her layoff plan, complete with the names of the persons targeted for layoff, to the Governor's office. Under the plan, eleven employees were scheduled to be terminated, seven of whom were over the age of forty. All four of the Public Contracts Unit Specialists were on the list: Salvato, Duffy, Robert Cione (age 43), and Mark Entwistle (age 33).

Entwistle's ultimate fortunes differed markedly from those of his three colleagues, however, because he managed to avoid termination—a fact on which Salvato and Duffy relied heavily at trial. Young Entwistle had just moved into the Public Contracts Section as a Human Rights Specialist from his former position as an Investigator in a different section of IDHR. Perhaps he picked up some gossip at the water cooler; perhaps he quickly discovered he did not like working as a Human Rights Specialist. Whatever the reason, he lasted a brief nine days in the Public Contracts Unit—just long enough for his name to appear on the initial layoff list, but not long enough for anything to happen to him. Instead, in spite of the fact that there were supposedly no job vacancies available for transfers, IDHR and CMS allowed Entwistle to bid on an open Investigator position

in another department on his eighth day in Public Contracts. Bombela approved the transfer on July 13, 1992, and CMS followed suit on July 28, 1992. Entwistle transferred in due course and was spared from the planned layoff.

On August 14, 1992, CMS notified the plaintiffs that their names had been placed on the recall list for the positions of Human Rights Specialist, Grades I and II, but not for any arguably lower positions (such as Investigator) or for any position that would involve bumping another employee out of the way. On September 1, 1992, the plaintiffs filed their charges with the EEOC. Somewhere between six months and one year after the layoff, IDHR hired, transferred, or promoted a number of younger employees—but no one was placed in the Human Rights Specialist, Grades I or II positions for which the plaintiffs were in line. Salvato and Duffy believed that IDHR's refusal to recall them was a form of retaliation for their having filed complaints with the EEOC.

## II

At summary judgment, the court agreed that Entwistle's fortuitous transfer from the Specialist position to the Investigator position was enough to create a genuine issue of fact about whether the plaintiffs had been wrongfully discharged (presumably under the theory that if Entwistle had received preferential treatment in avoiding the layoff, the plaintiffs had conversely received discriminatory treatment by having been deprived of a similar opportunity). However, the district court granted summary judgment for IDHR and CMS on the plaintiffs' retaliation claims. The court recognized the three elements of a retaliation claim: (1) that the person engaged in protected activity (here, filing the EEOC charge); (2) that she suffered an adverse employment action; and (3) that a causal link exists between the protected expression and the adverse employment action. See *Brenner v. Brown*, 36 F.3d 18, 19 (7th Cir.1994) (*per curiam*). The district court found that the plaintiffs had presented no evidence on the third element of their retaliation claim that might show a link between the filing of the EEOC charges and

IDHR's failure to rehire them. Because the court thought that it was undisputed that IDHR did not rehire anyone for more than a year after the plaintiffs complained to the EEOC, it held that too much time had passed to attribute IDHR's failure to recall the plaintiffs to any retaliatory action by IDHR.

■ On appeal, the plaintiffs contest the district court's factual assumption of temporal distance between the filing of the EEOC charges and IDHR's hiring or recall of others instead of them. Duffy, for example, claimed in his deposition that within six months of his layoff, a vacancy for which he was qualified opened and was given to an employee who had never before performed affirmative action work. The state defendants admitted that they had indeed filled an Investigator I position within six months, and that they had given a Human Rights Specialist, *Grade III*, position to an inexperienced person (though only after 13 months). However, even taking this evidence in the light most favorable to the plaintiffs and concluding that the district court incorrectly assumed that IDHR had not hired anyone for a full year post-layoff, the plaintiffs nevertheless did not demonstrate a genuine issue of material fact on their retaliation claim. All hairsplitting aside, we agree with the district court that the temporal distance between the EEOC complaint and the first point at which IDHR rehired *anybody* dooms the argument. *Cf. Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir.1998) (no inference of causation with five month lagtime); *Hughes v. Derwinski*, 967 F.2d 1168, 1174–75 (7th Cir.1992) (four months); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir.1992) (six months).

■ Furthermore, we believe that the plaintiffs' retaliation argument is simply misconceived. Remember that the recall list, which put the plaintiffs in line for only the Human Rights Specialist, Grades I and II positions, was generated *before* the plaintiffs' protected activity took place. It is therefore simply irrelevant that IDHR hired an Investigator I or a Human Rights Specialist, Grade III, because those positions were ones for which the plaintiffs were never being considered. We cannot characterize as retaliation IDHR's failure to go beyond what the recall list required, even if the plaintiffs would have been qualified for those positions. What the plaintiffs are really complaining of is not that IDHR "retaliated" against them by failing to recall them to jobs for which they were qualified, but rather that they suffered discrimination "with respect to [a] ... privilege of employment," 28 U.S.C. § 623(a)(1), by IDHR's failure to put them in line for positions other than Human Rights Specialists, Grades I and II. Had they believed their recall rights should have included a broader class of jobs, however, the plaintiffs could have appealed to the Illinois Civil Service Commission. See 20 Ill. Comp. Stat. 415/10(5), (12) (1998). More importantly, the plaintiffs did not raise this theory of liability before the EEOC, in their Amended Complaint, *cf.* ¶¶ 16, 20, before the district court at summary judgment, or in their briefs on appeal. The argument is therefore lost.

### III

Salvato and Duffy's second point on appeal is that the trial court erred in granting judgment as a matter of law against CMS. At oral argument, we confessed to some confusion about the basis of the plaintiffs' theory against CMS. As in *Goshtasby v. Board of Trustees of the University of Illinois*, 141 F.3d 761 (7th Cir.1998), at the most basic level the plaintiffs' action is against the State of Illinois as an "employer." 29 U.S.C. § 623. (We reaffirmed in *Goshtasby* that Congress permissibly abrogated state sovereign immunity under the Eleventh Amendment when it passed the ADEA—a holding with square applicability to this case.) But here the plaintiffs have named two agencies of the State, IDHR and CMS, as the defendants. The plaintiffs argue that CMS had the "final authority" to approve the IDHR layoff plan for compliance with Illinois law and all relevant nondiscrimination principles. From that premise, they conclude that a reasonable jury could have found that CMS intentionally (and discriminatorily) approved Entwistle's strategically timed transfer and the layoff plan that had a disproportionate impact on older workers. We disagree.

■ The plaintiffs' argument relies on speculation, for neither CMS's approval of

the layoff plan nor its permission for Entwistle's transfer comes close to showing that CMS intentionally discriminated against Salvato, Duffy, or any other older worker. (In this circuit, at least, the ADEA does not permit liability based solely on disparate impact. See *Blackwell v. Cole Taylor Bank*, 152 F.3d 666, 672–73 (7th Cir.1998); *Maier v. Lucent Technologies, Inc.*, 120 F.3d 730, 735 (7th Cir.1997); *Gehring v. Case Corp.*, 43 F.3d 340, 342 (7th Cir.1994).) At the most, the plaintiffs' evidence on the first point showed that Illinois took a more aggressive approach to the elimination of age discrimination than federal law required (if we assume, favorably to the plaintiffs, that CMS was responsible for purging all traces of disparate impact as well as actual discrimination from proposed layoff plans)—and that CMS fell down on the job. That is well short of a demonstration that CMS intentionally discriminated against these two particular individuals. Nor is their case helped by an . assumption that CMS knowingly allowed Entwistle to avoid termination, while approving the layoffs of the older workers. Nothing in the record suggests that CMS did anything but read papers about IDHR's plan to change Entwistle's position and fail to block it. In a large bureaucracy like the State of Illinois or the federal government, this type of interagency review is common. The Office of Management and Budget performs many general functions for all Executive Branch agencies; the General Services Administration does the same; but this does not turn personnel decisions of (for example) the Department of Commerce into OMB or GSA actions. Here, it was IDHR that decided to move Entwistle. To put the same point slightly differently, any role CMS may have played was in support of IDHR, and in the absence of a far more specific link to CMS's own actions, it was not appropriate to name it as a defendant.

## IV

■ We move then to the claim that went before the jury: Salvato and Duffy's argument that IDHR itself discriminated against them on the basis of age in its formulation and implementation of the layoff plan. The jury heard all of their evidence, including the evidence about the preferential treatment of Entwistle (which the judge properly held at the summary judgment stage was genuinely disputed), and it ruled in favor of IDHR. The plaintiffs make a feeble effort to argue that this verdict went so strongly against the weight of the evidence that the district court abused its discretion in denying their motion for a new trial, but they offer no concrete reason why we should disagree with the district court. District judges have broad discretion in ruling on Rule 59 motions based on the weight of the evidence, *Bachenski v. Malnati*, 11 F.3d 1371, 1375 (7th Cir.1993), and we see nothing to suggest that the district judge transgressed those boundaries here. There was evidence on both sides of the age discrimination argument before the jury. The jury chose to believe IDHR's version of events and not the plaintiffs', which is the end of the matter as far as any evidentiary challenge goes.

■ But the plaintiffs have one last arrow in their quiver: they assert that the trial as a whole was tainted because the district court mishandled the jury selection process when it refused to disqualify juror Floyd Abramson for cause. During the *voir dire*, the plaintiffs exhausted all of their peremptory challenges before they had seen the entire venire. Unfortunately from their perspective, the next prospective juror up was Abramson. He was a named partner in a small firm that sometimes appeared before the IDHR and the EEOC on employment law matters. The plaintiffs' attorney recognized the firm's name, because she had appeared against one of Abramson's partners in a contentious ADEA fight at some point in the past. She had never appeared opposite Abramson himself, however.

Knowing that much, the plaintiffs' lawyer moved to strike Abramson for cause. The district court took a few minutes to explore the question, during which time Abramson testified that: (1) his law firm spent only 10–15% of its time on employment matters; (2) the firm did not specialize in employment discrimination cases; (3) he personally was not an employment discrimination lawyer; (4) his firm had represented both plaintiffs and defendants in employment cases, and probably represented plaintiffs more fre-

quently; and (5) he thought that he could be fair and impartial. With the benefit of that additional information and Abramson's final assurance, the district judge denied the motion.

We review this kind of ruling for abuse of discretion, *United States v. Zizzo*, 120 F.3d 1338, 1349 (7th Cir.1997), and once again, we see nothing remotely approaching that standard here. The plaintiffs have tried to convince us that the district court should have "presumed bias" on Abramson's part, but while this court has on one occasion recognized that standard (also called the "implied bias" doctrine), see *Hunley v. Godinez*, 975 F.2d 316, 318–19 (7th Cir.1992), some courts have expressed doubts about the doctrine entirely. See, *e.g., Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir.1990) (majority of Supreme Court has never explicitly adopted or rejected the doctrine); *Person v. Miller*, 854 F.2d 656, 664 (4th Cir.1988) (questioning the viability of the implied bias doctrine). We need not resolve this question, however, for even if the doctrine exists, it would only apply in "extreme" or "extraordinary" cases. *Hunley v. Godinez*, 975 F.2d at 318–19. No such circumstances are present here. Moreover, the logical implication of the plaintiffs' argument would quickly lead back to a rule prohibiting lawyers from serving as jurors at all, which was the case in many states until fairly recently. But see S.D. Codified Laws § 16–13–10 (1998) (licensed attorneys still prohibited). In Illinois, ever since 1987 lawyers have been treated just like other citizens when it comes to jury service, *cf.* 705 Ill. Comp. Stat. 305/4 (1986) (repealed), and both state and federal courts handle bias questions on an individualized basis. That is what the district court did here, and the court's inquiry revealed no reason to strike Abramson for cause.

Salvato and Duffy failed to convince the jury that they were discharged because of their age. They have also failed to convince us that any of the district court's legal rulings, including its decision to grant summary judgment on the retaliation claim, its decision to grant judgment as a matter of law in favor of CMS, and its handling of the *voir dire* and the motion for new trial, were wrong. We therefore AFFIRM the judgment in its entirety.