Joseph HEARNE, et al., Plaintiffs–
Appellants,

v.

**BOARD OF EDUCATION OF THE
CITY OF CHICAGO, et al.,
Defendants–Appellees.**

No. 98–1403.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 13, 1998.

Decided July 16, 1999.

maining claim reinstated and stayed pending the outcome of certain parallel litigation in the state courts.

Gregory N. Freerksen (argued), Witwer, Burlage, Poltrock & Giampietro, Chicago, IL, for Plaintiffs–Appellants.

Thomas A. Ioppolo, Office of the Attorney General, Robert R. Hall, Jr., City of Chicago Board of Education, Kelly A. Skalicky (argued), Chicago Reform Board of Trustees, Law Department, Chicago, IL, for Board of Education of the City of Chicago, Illinois.

Thomas A. Ioppolo, Office of the Attorney General, Michael P. Doyle (argued), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Illinois Educational Labor Relations Board, State Board of Education, James R. Edgar and George H. Ryan.

Before CUMMINGS, ROVNER, and DIANE P. WOOD, Circuit Judges.*

DIANE P. WOOD, Circuit Judge.

In 1995, the Illinois General Assembly enacted Public Act 89–15, a broad-ranging measure designed to reform the Chicago public school system. In this case, teachers and other tenured employees of the Chicago Board of Education who were terminated from their jobs under the procedures established by the new legislation, together with the Chicago Teachers Union (CTU), sought declaratory and injunctive relief against certain sections of that statute. The individual plaintiffs also requested reinstatement and damages. The district court dismissed the bulk of the complaint for lack of jurisdiction and the remainder for failure to state a claim upon which relief could be granted. With one exception, we agree that none of the plaintiffs can proceed with the case, and we therefore affirm. We order the re-

## I

Underlying all of the plaintiffs' complaints is the undisputed fact that Public Act 89–15 applies only to the Chicago public school system—a system that the General Assembly expressly found to be in the throes of an "educational crisis." For many years, the Chicago schools have operated under provisions of the Illinois School Code that were tailor-made for them. Article 34, which establishes the school law for cities with more than 500,000 inhabitants, has been on the books for more than 35 years. See 105 ILCS 5/34–1 et seq. That population threshold has traditionally been a euphemism for the name "Chicago"; Article 34 has never applied to any other city, though it is of course possible that population growth in the future might ultimately bring places like Rockford (pop.143,263) and Peoria (pop.113,504) under its aegis if the legislature does not adjust the cut-off point.

Plaintiff Joseph Hearne, an African American, was a tenured teacher in the Chicago public school system. Plaintiffs Linda Daley and Andrew Hoffman, also African Americans, were career service employees of the Board of Education (to which we refer here as the "Reform Board," following the accepted post-amendment usage). Plaintiff CTU was and is the exclusive collective bargaining agent for more than 31,000 employees of the Reform Board, including teachers, certain assistant principals, school clerks, and teacher assistants. A majority of the individuals (51.7%) in the bargaining unit represented by the CTU (at the relevant time) were African Americans; minorities as a group were 64.6% of the bargaining unit. African Americans working as civil or career service employees (i.e. those who do

---

* Judge Cummings participated in the consideration of this case but died before the decision was rendered.

not have teaching certificates) at the Reform Board accounted for 63.1% of the workforce; minorities as a whole were 83.3%.

The General Assembly passed Public Act 89–15 on May 30, 1995. At that time, as a result of Republican victories at the polls in November 1994 and before, Republicans controlled both houses of the state legislature, and the Governor of Illinois, Jim Edgar, was also a Republican. This was despite, not because of, the efforts of the CTU and its members, who had unsuccessfully tried during the Fall 1994 election campaign to defeat the Republican candidates. Noting both this fact and the demographic fact that most of the legislators in the Republican majority hailed from downstate Illinois or the Chicago suburbs, the plaintiffs claimed in their lawsuit that Public Act 89–15 was passed to retaliate against them for their political activities.

According to the complaint, the legislation accomplished its retaliatory purpose in several ways. First, it amended section 34–15 of the Illinois School Code, 105 ILCS 5/34–15, to diminish the level of civil service protection available to career service employees. Prior to the amendment, these employees had the right to be terminated only for cause, and they had the right to independent judicial review of the hearing officer's decision in any termination case; afterwards, dismissal was possible without any showing of cause for Chicago employees, but the old system remained in place for educational employees elsewhere in the state. Second, the new legislation amended section 34–85 of the School Code, 105 ILCS 5/34–85, in a way that made it easier to fire tenured teachers. Before, Chicago public school teachers could obtain tenure after a three-year probationary period, and tenured teachers could be removed only for cause after a hearing before an independent hearing officer. The new legislation significantly reduced the procedural protections available to teachers facing removal.

The hearing officer's decision was no longer final, but instead became a recommendation to the Reform Board. Furthermore, the Reform Board itself was not expressly required to follow any particular procedures in coming to its own conclusion. Once again, these restrictions apply only to Chicago teachers; all other public school teachers in the state are entitled to have an independent hearing officer, not their employer, make the final termination decision. Last, Public Act 89–15 restricts the collective bargaining rights of Reform Board employees. In Chicago only, career service employees may no longer bargain over job security matters, and educational employees are precluded from bargaining over issues like the impact of charter schools on personnel, decisions to privatize and their impact on employees, layoffs and reductions in force, class size decisions, and the impact of experimental and pilot programs.

On May 6, 1997, the plaintiffs filed their complaint. They asserted claims under 42 U.S.C. §§ 1981, 1982, and 1983 and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., against the Reform Board, the Illinois Educational Labor Relations Board (IELRB), the State of Illinois, and Jim Edgar, then the Governor of Illinois. The complaint alleged that Public Act 89–15 violated the plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment, because it was a thinly disguised mechanism for racial discrimination and discrimination on the basis of political activity or affiliation, and that it deprived them of their property interest in continued employment without due process. The defendants responded with a motion to dismiss under Federal Rule of Civil Procedure 12(b), which the district court granted on January 14, 1998.

In its memorandum opinion, the court found that the suit for damages against the State, the Governor, and the IELRB was barred by the Eleventh Amendment. The Title VII suit against the State, while not vulnerable under the Eleventh Amend-

ment, was without merit because the State was not the relevant employer—the Reform Board was. Furthermore, the court found that the complaint had not asked for any injunctive relief against the State, the Governor, or the IELRB that properly could be granted. With respect to Hearne's claim, the court decided to abstain and dismiss because Hearne was also proceeding with a state court appeal of the Reform Board's decision to fire him. The court found no merit in Hoffman and Daley's claims, which, as with the CTU's claims, focused on the absence of a binding decision by an independent hearing officer. This was something that possibly could have been a subject of collective bargaining between the CTU and the Reform Board, the court thought, but the CTU had elected not to pursue that course. Until it did so, the district court implied that this aspect of the case was not ripe for decision. In any event, the district court held, there is no federal constitutional right to a procedure whereby the final decision is made by a hearing officer rather than the agency, no matter what rights state law may or may not have conveyed at any point. Last, the court rejected all claims based on the theory that singling out Chicago for unfavorable treatment was a proxy for discrimination based on race and political affiliation. It found a rational basis for treating the Chicago public school system differently from others in the state, and it found that in these circumstances it was not appropriate to probe the motives of the members of the General Assembly who voted for the law to see if race or political retaliation played a part in their thinking. Advising the plaintiffs that their remedy lay in the ballot box, not the courts, the district court thus dismissed the entire case.

## II

On appeal, the plaintiffs have urged that the district court erred when it held that there was a rational basis for singling out the Chicago public school employees for less generous employment rights than their suburban or downstate counterparts; that strict scrutiny should be applied to the legislation both because it was passed in retaliation for the CTU's political opposition to Republican candidates and because it was intentionally crafted to have a disparate impact on African American and other minority employees; that the State defendants were not immune under the Eleventh Amendment; that the district court should not have abstained in Hearne's individual case; and that the court erred in finding that Daley's, Hoffman's, and the CTU's claims were not ripe for decision. We take up these points in turn.

A. Rational Basis for Chicago–Only Legislation

■ The plaintiffs concede that the proper test under the Equal Protection Clause for their geographical discrimination argument is whether the legislature had a rational basis for devising a separate system for Chicago. They are right, *Kadrmas v. Dickinson Pub. Sch.,* 487 U.S. 450, 457–58, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988); *Hodel v. Indiana,* 452 U.S. 314, 331–33, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981); *Peterson v. Lindner,* 765 F.2d 698, 705 (7th Cir.1985), and we agree with the district court that the sections of this legislation now before us pass that minimal hurdle. As the district court pointed out, the Illinois statute books are riddled with laws that treat communities with more than 500,000 residents—*i.e.,* Chicago—differently from smaller ones. See, *e.g.,* 10 ILCS 5/11–3, 5/11–5 (governing the establishment of election precincts); 40 ILCS 5/5–101 *et seq.* (governing policemen's annuity and benefit funds in cities with more than 500,000 residents). With respect to public schools, it was entirely rational for the legislature to believe that the logistics of running a school system designed to serve 431,085 students (the number of students enrolled in Chicago's public schools for the 1997–98 school year) were far dif-

ferent from those implicated in systems serving less than a tenth of that number.

The legislature was entitled to take the position that the optimal way to assure accountability of teaching and non-teaching staff members would be different because of the scale of operations in Chicago. See *Pittman v. Chicago Bd. of Educ.*, 64 F.3d 1098, 1103 (7th Cir.1995) (noting that "it is common knowledge that the public schools of Chicago are a troubled institution" and that legislatures should be permitted to experiment with methods of governing public institutions without undue interference from courts). The crisis it perceived in Chicago also was a legitimate reason to take immediate action there, leaving open the possibility of extending similar measures to other places. See *Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *United States v. Lewitzke*, 176 F.3d 1022, 1027 (7th Cir.1999). What appears to the plaintiffs as "less generous employment rights" may have seemed to the legislature as increased flexibility for school administrators to take swift action to correct problems. No matter: even this brief discussion demonstrates that a rational basis underlay the General Assembly's decision to give special treatment to Chicago, and we agree with the district court that the complaint failed to state a claim to this extent.

**B.** Political Retaliation or Disparate Racial Impact

■ 1. *Political Retaliation Claims.* First, we consider the allegations that Public Act 89–15 was intended as retaliation for the CTU's political opposition to the Republican candidates who eventually won election to the General Assembly and the governorship. Plaintiffs rely heavily on the decision in *Esmail v. Macrane*, 53 F.3d 176 (7th Cir.1995), to support their complaint on this point. But *Esmail* presents an entirely different situation. There, the individual plaintiff claimed that after he withdrew his political and financial support from the Mayor of the City of Naperville, the city's liquor control commission denied two liquor license applications that he had pending. Vengeance, he alleged, was the only motive for the commission's action. But the grant of a license is a particular government benefit that may not be denied arbitrarily and capriciously, or for reasons that discriminate against an individual.

In contrast, there is no rule whereby legislation that otherwise passes the proper level of scrutiny (and does not infringe on a fundamental right, *cf. Anderson v. Celebrezze*, 460 U.S. 780, 786–87, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), or rest on an impermissible distinction such as race, *cf. Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)) becomes constitutionally defective because one of the reasons the legislators voted for it was to punish those who opposed them during an election campaign. Indeed, one might think that this is what election campaigns are all about: candidates run on a certain platform, political promises made in the campaign are kept (sometimes), and the winners get to write the laws. The point that distinguishes this case from others like *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996), and *Board of County Commissioners, Wabaunsee County v. Umbehr*, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996), is that the latter two cases involved specific contracting between the state and certain individuals, while the case now before us implicates the crafting of legislation designed to serve one of the largest public school systems in the country. It is simply irrelevant as a matter of law that some individual legislators who voted for the reform legislation may have felt secretly gleeful that it would make it easier for school administrators to terminate some unspecified members of the CTU.

■ 2. *Disparate Racial Impact Claims.* The plaintiffs sensibly acknowl-

edge that they must show actual intent to discriminate on the basis of race in order to prevail on this theory, but they assert that their allegations to that effect are automatically enough to defeat a motion to dismiss on the pleadings. They distinguish *Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972), on which the district court relied, on the ground that the Supreme Court there found a rational purpose for each of the welfare programs the State of Texas had crafted, and thus that the differences among the programs could not amount to an equal protection violation even though one could observe a racially disproportionate impact. Ignoring the difference between a constitutional claim and one based on Title VII, they also argue that their allegations more closely fit the pattern of *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), than they do *Jefferson.*

In our view, the controlling case here is *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), which had the following to say about an equal protection challenge brought by a woman to a Massachusetts statute that gave an absolute lifetime preference to veterans over other applicants for state civil service positions—a preference that operated overwhelmingly to the advantage of men:

> "Discriminatory purpose," however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

442 U.S. at 279, 99 S.Ct. 2282 (citation omitted). See also *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 271–72, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). Just as there was nothing in *Feeney* to suggest that the Massachusetts legislature (which presumably was well aware that the overwhelming majority of veterans were male) decided to enact a veterans' preference law because it wished to disadvantage women, there is nothing here to indicate that the Illinois General Assembly structured the Chicago school reform legislation specifically because it wanted to disadvantage African Americans. There are substantial numbers of African Americans in many other cities in the state, and it is simply too great a stretch to say that the population represented by the Chicago school system is such a good proxy for African Americans that the ostensibly neutral classification is "an obvious pretext for racial discrimination." *Feeney,* 442 U.S. at 272, 99 S.Ct. 2282, citing *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). The plaintiffs' saying this is so in their pleadings is not enough to allow them to survive a Rule 12(b)(6) motion, when the legislation itself contains not a hint of an impermissible racial classification.

## C. Eleventh Amendment Immunity for State Defendants

■ The district court correctly noted that neither the State of Illinois, (former) Governor Edgar in his official capacity, nor the IELRB could be sued for damages under 42 U.S.C. §§ 1981, 1982, or 1983. We regard this as so well established that it needs no further discussion here. See *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 64–71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Kroll v. Board of Trustees of the Univ. of Ill.,* 934 F.2d 904, 909 (7th Cir. 1991); *Rucker v. Higher Educ. Aids Bd.,* 669 F.2d 1179, 1184 (7th Cir.1982). Governor Edgar is also plainly entitled to dismissal to the extent the plaintiffs might have been seeking damages against him in his individual capacity, because it is clear that there is no *respondeat superior* liability under those statutes, *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Garrison v. Burke,* 165 F.3d 565, 571 (7th Cir. 1999), and he had no personal role to play

apart from his official act of signing the legislation.

■ The only individual state official who was named as a defendant was, once again, Governor Edgar. It is true that the Eleventh Amendment may not bar an action for declaratory or injunctive relief against such a person when *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), applies. But compare *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). In this case, however, the plaintiffs have not and could not ask anything of the governor that could conceivably help their cause. (We also put to one side the formality that Jim Edgar is no longer Governor of Illinois at all, and we assume for the sake of argument that a substitution of the incumbent governor, George Ryan, could occur.) As the State has pointed out in its brief, the governor has no role to play in the enforcement of the challenged statutes, nor does the governor have the power to nullify legislation once it has entered into force. Technically, therefore, it is not the Eleventh Amendment that bars the plaintiffs' action for prospective injunctive relief against the governor; it is their inability to show that he bears any legal responsibility for the flaws they perceive in the system.

■ Finally, the State defendants concede that the Eleventh Amendment does not bar the plaintiffs' suit against them insofar as it is based upon Title VII. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); *Varner v. Illinois State Univ.*, 150 F.3d 706, 709 (7th Cir.1998). But here again, another obstacle stands in their way. Title VII actions must be brought against the "employer." In suits against state entities, that term is understood to mean the particular agency or part of the state apparatus that has actual hiring and firing responsibility. See *EEOC v. State of Illinois*, 69 F.3d 167, 171–72 (finding that local school districts, not the State of Illinois, are the "employers" of public school

teachers in Illinois for the purposes of Title VII); see also *Salvato v. Illinois Dept. of Human Rights*, 155 F.3d 922, 926 (7th Cir.1998). Neither the Governor's office, the State of Illinois as a whole, nor the IELRB is the "employer" for Title VII purposes of any of these plaintiffs, which is the end of this part of the case against these defendants.

### D. Abstention in Hearne's Case

■ Hearne is under the misapprehension that the fact that he chose to split his claims means that the federal court erred by abstaining under *Younger v. Harris*, 401 U.S. 37 (1971), and *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). As he points out, he raised only state constitutional and statutory claims in his state court suit, and he limited his claims in the federal suit to those arising under the federal Constitution and federal statutes. He also notes that he had not yet received his "right-to-sue" letter from the federal Equal Employment Opportunity Commission (EEOC) at the time he initiated his state court action (the timing of which was governed by the Illinois Administrative Review Act, 735 ILCS 5/3101 *et seq.*). Nowhere, however, does Hearne assert that the Circuit Court of Cook County had no power to entertain the federal claims, in the sense of subject matter jurisdiction. In fact, Illinois courts allow amendments to pleadings "[a]t any time before final judgment ... on just and reasonable terms," even if the amendment "chang[es] the cause of action or defense or add[s] new causes of action or defenses." 735 ILCS 5/2–616(a). Most importantly for present purposes, the Circuit Court of Cook County entered an order in Hearne's favor, finding that section 34–85 of the School Code (*i.e.* the section changing the decision of the independent hearing officer from a final one to a recommendation to the Reform Board) violated the due process rights of tenured teachers under the

state constitution. The parties appealed that decision to the Illinois Supreme Court, which reversed the circuit court's decision in an opinion issued January 22, 1999 (after this court heard oral argument). See *Hearne v. Illinois State Bd. of Educ.*, 185 Ill.2d 443, 236 Ill.Dec. 12, 706 N.E.2d 886 (Ill.1999).

The Illinois Supreme Court ruled that the trial court had improperly reached the question of the constitutionality of section 34–85, because the court had also granted relief to Hearne under ordinary principles of administrative review. *Id.* at 892. That ruling also had the effect of destroying the supreme court's jurisdiction under Rule 302(a) of the Rules of the Illinois Supreme Court, which provides for direct appeals from final judgments of the circuit courts where a statute has been declared invalid. *Id.* The Illinois Supreme Court therefore remanded the case to the circuit court, so that the portion of the order reaching the state constitutional question could be excised and a modified order re-entered. *Id.* We have not been advised of any further steps that might have been taken in this litigation, but the effect of the Illinois Supreme Court's decision was to allow the ordinary appellate process to go forward, if the parties so desired.

Thus, it appears that this case is still one in which proceedings in the state trial court have come to a close and further appellate review is possible. That posture is, for all practical purposes, identical to the one we faced in *Rogers v. Desiderio*, 58 F.3d 299 (7th Cir.1995). Both *Rogers* and the present case involve the question of the preclusive effect of a state court judgment that is still pending on appeal—a matter that is governed by the full faith and credit statute, 28 U.S.C. § 1738. For the same reasons we discussed in *Rogers*, we do not find *Younger* particularly useful here, since the kind of extraordinary state interest that underlies the *Younger* command to abstain in favor of a pending state court proceeding does not appear to be present. Yielding to the state court pro-

cess under the "wise judicial administration" principles of *Colorado River* is another matter. 424 U.S. at 817, 96 S.Ct. 1236. *Colorado River* acknowledged that more than the simple pendency of an action in state court pertaining to the same matter as a suit in federal court is necessary before the federal court should dismiss or stay an action. *Id.* at 817–19, 96 S.Ct. 1236. On the other hand, as in *Rogers*, we have more than that: the state trial court has actually concluded its consideration of the case. The clarity of the Illinois law of preclusion (which applies here) on the effect of a judgment that is still being appealed has not changed appreciably since we decided *Rogers*. Nevertheless, the principles of sound judicial administration that animated the decision in *Colorado River* caused this court to require a stay of the federal proceedings in *Rogers*.

Here, the district court dismissed the action against Hearne, rather than simply staying it. To this extent, we believe that it erred. We therefore instruct the court to reinstate Hearne's case and enter a stay pending the outcome of the state court proceeding. We make no comment on the merits of either his federal or his state claims against the Reform Board (the only remaining defendant), although we note that the circuit court found merit in his state law arguments and, as far as we know, an appeal is still possible from the final order as modified in accordance with the Illinois Supreme Court's decision.

**E. CTU's, Daley's, and Hoffman's Claims**

■ 1. *The CTU.* We begin with the CTU's claims, bearing in mind that we have already decided that none of the State defendants is properly in this suit. There is an immediate problem with the remaining parts of the CTU's suit. As we have already noted, the CTU is the union that represents all of the teaching employees and many of the career service employees of the Chicago Public School District. Although it may be possible for a labor union to represent its members as a plaintiff in a Title VII action, so long as it seeks prospective relief only, see *Local*

*194, Retail, Wholesale and Dep't Store Union v. Standard Brands, Inc.,* 540 F.2d 864 (7th Cir.1976), the allegations in the CTU's part of the complaint do not state a Title VII claim. Nothing supports a theory of discrimination based on disparate treatment and, to the extent the CTU may be attempting to advance a theory based on disparate impact, there is no allegation that the Reform Board has terminated a disproportionate number of African Americans given the racial composition of the workforce under its employ. *Cf. Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 310–12, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1976) (noting the importance of focusing on the appropriate labor market in assessing the discriminatory impact of a challenged employment practice). The claim that Public Act 89–15 has had a disparate impact on minorities statewide does not implicate the Reform Board, but rather at most raises again the claim of geographic discrimination against the State defendants, which, as we have discussed, is not sustainable.

Second, this is not an action under any particular collective bargaining agreement, in which the CTU might be complaining that it was precluded by virtue of the school reform legislation from bargaining over certain topics. (We assume, because this case came up on the pleadings, that it would be possible to entertain labor-law-based theories notwithstanding the plaintiffs' failure to mention them.) It is unclear to us at this juncture whether the CTU might, on behalf of its members, be able to secure the agreement of the Reform Board to procedural protections that are broader than the statutory minima. At the very least, there has been no suggestion that efforts by the CTU to instigate such negotiations (and thus to test how far the legislation restricts collective bargaining) have been rebuffed. We therefore agree with the district court that the CTU's claims cannot go forward: if the theory is Title VII, there is no basis for a case against the Reform Board; if the theory arises under general labor law, the CTU's arguments are not ripe for decision.

*2. Daley and Hoffman.* Last, we consider whether the district court correctly concluded that Daley and Hoffman, two administrative employees of the school district, suffered no injury that was sufficiently immediate for purposes of justiciability. Their claims do not affect most of this litigation, because they challenge only the role of the independent hearing officer under the new legislation. It is undisputed that both Daley and Hoffman were fired from their jobs for cause, pursuant to the Reform Board's policy and the collective bargaining agreement. Thus, the fact that they might have been fired for no cause under the reform legislation is of only theoretical interest to them. Nevertheless, as they point out in their briefs, they were fired, and that is enough to make their claims ripe for decision.

A person challenging the adequacy of procedures does not have the burden of showing that the outcome would certainly have been different had the proper procedures been followed. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 544, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). However, Daley and Hoffman appear to believe that they have a federal due process right to have final termination decisions rendered by an independent hearing officer rather than the Reform Board. That is not so. See *United States v. Raddatz,* 447 U.S. 667, 680–81, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) (noting that it is common for the ultimate decisionmaker in an administrative proceeding to be a commission or board drawn from within the agency, and that due process does not require the commission or board to defer to the findings of a hearing officer). Moreover, to the extent Daley's and Hoffman's complaints are based on the difference between the level of procedural protections afforded them under the previous regime and that provided under the new legislation, the district court correctly determined that they had no protectible property interest in the former system. *Pittman,* 64 F.3d at 1104–05 (holding that when a statute creates a property right in

job tenure the legislature may eliminate that right by amending the statute). We therefore find that, while Daley's and Hoffman's due process claims are ripe for adjudication, they nonetheless have failed to state a claim upon which relief may be granted.

### III

In summary, we AFFIRM the dismissal of all claims against the State of Illinois, Governor Jim Edgar (and, to the extent substitution is proper, his successor Governor George Ryan), and the Illinois Educational Labor Relations Board. With respect to Hearne's claims against the Reform Board, we VACATE the order of dismissal and REMAND for purposes of staying the action pending the final outcome of the proceedings in state court. Finally, with respect to the CTU, Daley, and Hoffman, we AFFIRM the district court's judgment dismissing all claims. The costs of the appeal are assessed against the plaintiffs, without prejudice to Hearne's right to seek a reallocation of costs before the district court if and when he ultimately prevails in his individual action against the Reform Board.